Filed 6/25/21  In re J.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.M., et al., Persons Coming Under the Juvenile Court Law. | |
| | D078384 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519556AB) |
| v. | |
| Ja.M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Joanne D. Willis Newton, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel for Plaintiff and Respondent.

INTRODUCTION

J.M. and Ja.M. (the Children) were removed from their mother's care due to repeated exposure to domestic violence, nearly four years ago when they were two years old and two months old, respectively. Now six and four years old, the children have been in a prospective adoptive home for nearly a year. Ja.M. (Mother) appeals from juvenile court orders which denied her petition for return of the Children, pursuant to Welfare and Institutions Code section 388,[1] and terminated her parental rights. She argues the court abused its discretion by denying the petition and erred in determining the Children were adoptable. We conclude the court's rulings were proper and within its discretion and we affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Detention, Jurisdiction, and Disposition*

In August 2017, the San Diego County Health and Human Services Agency (the Agency) filed dependency petitions for the Children following two domestic violence incidents. (§ 300, subd. (b).) During the first incident, the Children's father, R.P. (Father),[2] spat on Mother and struck her on the face with a broomstick, causing her injuries. Father was arrested but, after getting out of custody, he returned to the home days later and forced his way into Mother's bedroom and threatened to kill her. He was arrested again.

---

[1]     Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     Father and Mother's estranged husband, J.G., are not parties to this appeal. We discuss them only as needed.

2

The Children were present both times.  J.M. was two years old and Ja.M. two months old; we refer to them as the older and younger child, respectively.

The Agency alleged Mother had demonstrated a failure to protect herself and the Children from physical and emotional harm.  Despite the back-to-back incidents of domestic violence, Mother was initially ambivalent about getting a restraining order against Father, stating she " 'can't make a promise' that she will get one, and that she does not have time."  She later obtained a restraining order against Father.  The Agency noted Mother had demonstrated "a chronic pattern of domestic violence in her relationships over the course of the [C]hildren's life[.]"  Mother had a history of domestic violence with Father, her estranged husband, and another man.  Although it appeared she was mainly the victim of domestic violence, Mother was reported the aggressor in some instances and was arrested in August 2016 for domestic violence battery against Father.

Mother and Father had a history of referrals to Child Welfare Services (CWS) dating back to 2015, when the older child was born.  In May 2016, at 10 months old, the older child was taken to Polinsky Children's Center after the police responded to a report that Father was drunk and arguing with Mother.  Both parents were reportedly homeless, Mother was arrested on outstanding warrants for misdemeanor charges for possession of a controlled substance, and Father was determined to be in no condition to care for the child.  The child was briefly detained and returned to the parents a few days later.  There were multiple other referrals up to 2017, when the younger child was born.  The CWS history showed an "on-going history of domestic violence and risk of emotional abuse to the children."

Mother immigrated from the Philippines as a young child.  She has two older children from prior relationships, an adult daughter raised by her sister

3

from age two and a teenage son adopted by a paternal relative at approximately age six. Both of these children live outside California and Mother's last contact with her now-teenage son occurred in 2012.

At the detention hearing in August 2017, the court detained the Children, and Mother was given liberal and unsupervised visitation and reunification services. Because the Children were under three years of age, pursuant to section 361.5, subdivision (a)(1)(C), the court advised Mother she had "six months to participate regularly and make substantive progress in any court-ordered treatment programs or to cooperate or avail . . . herself of services provided in the case plan, and the failure to do so may result in termination" of reunification efforts and that after termination of reunification efforts, "parental rights could be terminated[.]" The court later repeated this advisal to Mother at another hearing.

In November 2017, the court held a contested adjudication and disposition hearing. It sustained the petitions as true by clear and convincing evidence, took jurisdiction over the Children, removed them from parental custody, and placed them in foster care. At this time, Mother continued to receive reunification services, had begun attending domestic violence group and parenting classes, and received unsupervised visitation with the Children twice a week. The Children were observed to be "healthy and happy," but the Agency noted "concerning behaviors" by Mother during the visits, including her failure to recognize the older child at one visit and her lack of insight into the needs of the younger infant child. Mother had difficulty soothing the infant child, who cried uncontrollably during visits, leading to visits being supervised at the CWS office.

By the time of the six-month review hearing in May 2018, concerns arose that Mother was still in touch with Father, in violation of the

restraining order.  CWS had received another referral alleging emotional abuse, arising from Mother's report in May 2018 that Father had struck her with a wooden stick.  It was later determined the Children were not present and although Mother reported the incident occurred, she later denied it happened.  Mother continued with her domestic violence group classes and after she initially demonstrated that she understood domestic violence dynamics and their impact on her children, her progress declined when she lost her housing and was unable to focus in the group classes.  The Agency then referred Mother to individual therapy.

Mother continued visits with the Children three times a week at the CWS office.  She had a visitation coach but did not benefit from it.  She would come late to the appointments, preventing her from receiving help before and after visitations, and she would "argue against the visitation concepts."  The coach terminated the sessions due to Mother's "lack of compliance."  Mother subsequently made progress and resumed unsupervised visits.  During this time, the Agency noted Mother consistently visited the Children, the younger child was "doing better with visits" and crying spells started "to lessen," and Mother was "observed to provide care for the [C]hildren during the visit[s]."

The Children remained with the same foster care family since their removal and were doing well.  They had been referred for services to address developmental matters, including speech concerns for the younger child and emotional issues for both, and both were attending therapy.

II.

*Contested 12-Month Review Hearing and Termination of Services*

At the six-month review hearing, reunification services were extended to a 12-month review hearing, which was ultimately held in April 2019—approximately 20 months after the Children's removal from Mother.

5

By this time, Mother's progress had "declined" and the Agency was recommending the court terminate reunification services. Mother requested the court return the Children to her, or alternatively continue reunification services for an additional 60 days to allow the Children to transition into her home or extend reunification services to a 24-month period. At the 12-month review hearing, the court received into evidence the Agency's multiple status review reports and heard testimony from Mother's therapist, Elizabeth Griffith-Tate, and the social worker, LaShawn White, which evidence we summarize below.

In July 2018, Mother had been arrested for domestic violence battery against Father. The older child reported to her caregivers that "she had seen 'mommy and daddy[.]' " Because of the additional reports of domestic violence, Mother's visits with the Children were again supervised at the CWS office. In December 2018, the Agency began to transition Mother back to unsupervised visits with the Children outside the CWS office. However, after the first unsupervised visit, the older child "returned stating that she was with the mother and the father and they were in a fight where the mother hit the father." On a second visit, Mother did not return the Children at the designated time and upon return, the older child again told her caregiver that "she saw the father at the mother's house."

In January 2019, CWS received a referral of emotional abuse arising from a report of domestic violence between the parents with Mother as the aggressor. The older child reported " 'mom and dad fighting.' " During investigation of the referral, the older child "was consistent with her statements in stating that the mother hit the father while they were in the store." Mother, however, denied committing any domestic violence or having contact with Father. There was no police report of any recent incidents of

6

domestic violence and the investigation was closed as "inconclusive." However, Mother's visits were once again supervised at the CWS office because of concerns that she was continuing to have contact with Father, in violation of the restraining order.

Mother was initially referred to individual therapy in May 2018 to address the domestic violence issues, but she did not begin until February 2019. The first referral closed because the therapist did not specialize in domestic violence treatment and the second referral closed because Mother declined to participate, stating she was unaware therapy was required. In February 2019, Mother started individual therapy with Griffith-Tate, who reported Mother was cooperative. Griffith-Tate could not report to the Agency whether Mother would follow through with the safety plan they devised, but later testified she believed Mother could. Griffith-Tate believed Mother could benefit from additional services to safely reunite with the Children, but testified she currently did not believe the Children could be safely returned to Mother. Griffith-Tate also testified Mother told her the Children "lied" about seeing her with Father or that any domestic violence had occurred. Griffith-Tate opined that the older child may be experiencing "re-traumatization," in which she is describing past incidents of domestic violence as if they were presently occurring.

In May 2018, Mother had also been referred to a parenting and visitation program, Incredible Families, because it appeared she had difficulty understanding the Children's developmental needs. The initial referral was closed because Mother was not responding to efforts to schedule an assessment appointment and she had been arrested in July 2018 for domestic violence. She was re-referred in November 2018 and later completed the program, but the program found she rarely responded

appropriately to the Children or put their needs ahead of her own, and only occasionally demonstrated a parental role. Accordingly, although visits mostly went well, she had trouble assisting the Children and monitoring both at once, such as when staff alerted her the younger child put a glue stick and a plastic knife in her mouth and when the older child threw things, yelled, and wrote on the wall to get her attention. Mother also had difficulty understanding the older child was " 'potty trained' " and her yelling at the child led the child to "bec[o]me scared with her mother when she had to use the restroom and [she] would cry and urinate on herself." The Agency provided Mother with a Tagalog interpreter to remove any language barrier, but Mother still had difficulty understanding and implementing the parenting education.

The Children were doing well in foster care and receiving services for their developmental needs, but the caregiver could not commit to adoption. Both girls were current on their well-child examinations and "generally healthy." The older child had been attending a Head Start program since July 2018 and was doing well, and the younger child was receiving weekly in-home infant education. Both children had been referred for speech evaluation.

After more than 12 months of reunification services, the Agency determined Mother had not shown an understanding or an ability to put into practice the concepts of protecting herself and the Children from exposure to domestic violence and responding to the Children's developmental needs. The Agency was concerned that "[M]other will continue to have contact with the father and will place herself and her children in significant harm" and she continued to "struggle[ ] in her visitation with the [C]hildren." It did not

believe Mother could safely reunify with the Children and recommended services be terminated.

At the conclusion of the evidence, the court found the Children were not ready to return to Mother and she was not ready to "receive them safely into her home," and it was not in the Children's best interests to continue reunification services. The court noted Mother had failed to take advantage of services "until quite recently," and "[m]ore alarmingly than the failure to handle the children perfectly at every interaction is the continued contact between [Mother and Father] who, . . . the [c]ourt just noted, . . . [is] a danger to [Mother] and to the children." In so finding, the court believed the older child's statements of seeing Mother and Father together on at least two occasions and Mother hitting Father on one of those occasions, and rejected Griffith-Tate's opinion that the child's statements were a result of "re-traumatization." Accordingly, the court found by clear and convincing evidence the Agency had met its legal burden and terminated reunification services, and set the matter for a section 366.26 hearing to determine a permanent plan for the Children.

## III.

### *Contested Sections 388 and 366.26 Hearing*

In July 2019, the Agency filed its section 366.26 report, authored by social worker Naomi Miller-Wave, and recommended the court terminate Mother's parental rights and order a permanent plan of adoption for the Children. The Agency believed the recommendation was in the Children's best interests, explaining they were accustomed to depending on others and did not view Mother in a parental role, and it determined the Children were "highly adoptable."

In September 2019, Mother filed a section 388 petition for return of the Children with family maintenance services, or alternatively for additional reunification services with expanded visitation. She argued there was a change in circumstances, including that she had continued therapy, "gained valuable insight into how domestic violence has impacted her children," and could now safely parent them; she had secured a job, reconnected with a support network, and has not had contact with Father. Mother also argued return was in the Children's best interests because they could "continue to develop a loving and parental bond[.]" The Agency opposed Mother's request.

In late September 2019, the court found Mother had made a prima facie showing on her section 388 petition to warrant a hearing and set the petition to be heard with the contested section 366.26 hearing. But the hearing was not heard until December 2020, after several continuances were granted to allow the Agency to further explore the Children's adoptability and placement with maternal relatives and further delays were caused by the COVID-19 pandemic shutdown of court services beginning in March 2020.

A.    *Summary of Evidence*

At the hearing, the court admitted into evidence the Agency's section 366.26 report and multiple subsequent addendum reports and Mother's exhibits, which included visitation logs and Mother's letter to the court discussing her progress, her love for the girls, and how she wants them back because they "give [her] a greater purpose[.]" Griffith-Tate and Miller-Wave testified. We summarize the evidence received by the court below.

1.    *The Agency's Reports*

*Mother's Visits with the Children.* Since reunification services were terminated in April 2019, Mother continued to have supervised visits with the Children. In March 2020, due to the COVID-19 pandemic, the visits went

to video and telephone contact. In-person visits resumed in July 2020. The Agency observed that Mother's visits were "overall consistent" but "the quality of visitation [was] lacking, with the girls frequently stating that they do not want to go to their visits and requesting to end visitation early." During visits, the Children would at times greet Mother with a hug, but frequently rejected her affection, including thwarting her kisses, touches and hugs and telling her, "Mommy I don't love you." The Agency noted that Mother "continue[d] to have difficulty in managing the [Children's] behavior during visitation and modulating her own reactions to the [Children's] emotions to determine what they need at any given moment."

Mother also had conflicts with the visitation monitors, including yelling at them when they tried to help. At one visit, a social worker had to "physically intercept [a] situation to deescalate" Mother's interaction with the older child. When Mother continued to yell at the child, the social worker ended the visit and Mother called her a "bitch." Visits "continued to deteriorate." In October 2020, Mother was banned from the family visitation center, after she yelled and swore at a visitation monitor. When the monitor ended the visit, Mother continued yelling and scratched the monitor's hand as she lunged to hug and kiss the Children goodbye.

Mother then had supervised video and telephone visits with the Children. The older child increasingly said she did not want to talk to Mother and told the social worker she was not her "mommy anymore." In-person visits resumed in December 2020 and while the Children would occasionally still greet Mother with a hug and call her " 'Mommy,' " they continued rejecting her affection.

*Children's Prospective Adoptive Caregivers.* In July 2020, the Children were placed with new caregivers who had committed to adopting them. The

11

Children had in-person and video visits with their new caregivers to help transition them into the new home. After one visit, the Children, unprompted, began calling their new caregivers "Mommy" and "Daddy." At a visit with Mother, the older child sat at a picnic table cross-legged with her hands in a prayer position and when the social worker asked what she was doing, the child said "she was praying to go home to see her daddy," referring to her new male caregiver. Another time, the older child told Miller-Wave that " 'I didn't have a mom and dad [before placement with her new caregivers] and now I do.' " During her visits to the new caregivers' home, Miller-Wave saw the Children were "happy," "seeking the caregivers out for comfort and attention," and "adjusting well." Both children expressed that they " 'love[d]' " their new caregivers.

*Children's Developmental Progress.* At the time of the hearing, the older child was five years old and the younger child three years old. Both had experienced some developmental delays, were clients of the Regional Center, were receiving speech therapies and had attended behavioral therapy with Rady Children's Hospital KidSTART clinic. But over the course of the reporting period from April 2019, both children made substantial progress, including completing speech therapy and behavioral therapy. Since placement with their new caregivers, Miller-Wave had also "noticed a marked increase in [the younger child's] speech" and both children had adjusted well and "shown tremendous developmental progress." The older child had also become a "nurturing big sister" to the younger child.

Earlier, in January 2019, concerns arose that the younger child was showing signs of being at risk for autism and she was referred for a comprehensive evaluation. She was evaluated in August 2020 and determined "not fully autistic," showing "only . . . a portion of the autism

12

criteria in speech and language." The examining doctor recommended she attend preschool to improve her socialization, speech and language skills and obtain a referral for speech therapy. She began preschool in the Fall of 2020. By the time of the hearing, the new caregivers reported she was "talking much more," speaking in "4 word sentences" "count[ing] to 10" and was "fully potty-trained."

The older child began her second year in a Head Start program with an individualized education program (IEP) under a qualifying disability of speech impairment, but she no longer required an IEP by January 2020 and had completed preschool. She was earlier diagnosed with attention deficit hyperactivity disorder (ADHD) and prescribed psychotropic medicine, but never took it due to Mother's opposition and reservations by her preschool teacher. By the time of the hearing, the new caregivers reported they had no concerns with the child's attention or schoolwork in the home or at school and did not believe she required further intervention at the time. She started Kindergarten in the Fall of 2020 and was going to be evaluated for any further IEP need. Her teacher reported she "loves school" and is at the "top of her class." The new caregivers had also hired a tutor to help her with schoolwork. The Agency found the current interventions sufficient.

Although both girls had met their therapeutic goals by the time of the hearing, their therapist "thought it would be a good idea to expand emotional therapy and have [them] receive therapy sessions through KidStart again." At the time, they were on a waitlist.

*Mother's Progress.* Since reunification services were terminated in April 2019, Mother was making progress in her own life and was continuing therapy with Griffith-Tate. She had enrolled in a certified nursing assistant (CNA) certificate program and completed a clinical internship for her CNA

13

program by August 2020. At the time of the hearing, Mother was employed full-time at a health facility and living in a single occupancy residence and she was paying her full rent. Griffith-Tate reported to the Agency that Mother was "very strong, has insight, and has shown growth," and she believed Mother had met her therapeutic goals and would be able to safely care for the children.

*Domestic Violence.* In one joint therapy session with Mother and the children, the older child told the therapist she had seen domestic violence between Mother and Father, but Mother responded, " 'that didn't happen, don't say that!' " The therapist discontinued the joint therapy sessions as "it was not a safe place for [the older child] to share and express her feelings on what she had seen." On another occasion, the therapist observed the older child exhibit a "fear-response where she was crying when she saw [Mother]." Mother claimed she no longer had contact with Father.

*Adoptability.* The Agency determined both Children were specifically adoptable as a sibling set as they currently lived with approved caregivers who were committed to adopting them. The Agency also determined both Children were generally adoptable as a sibling set "as there are several San Diego Resource families approved to adopt children with similar characteristics to the girls, including their sweet and energetic personalities, their . . . ethnicity, good health, with history of paternal mental health and drug abuse, as well as some developmental delays." "The Agency [was] confident that they would be able to find an adoptive home for the girls if they needed to be removed from their current placement."

2. *Miller-Wave's Testimony*

Miller-Wave testified she had no reason to believe that Mother has had contact with Father "within the last six months to a year," but noted Father

14

had been incarcerated "for the majority of the past year" and believed he was released only a month ago. She acknowledged she had no information that Mother has engaged in any "new domestic violence situations or relationships" and Mother had completed her domestic violence group classes.

Miller-Wave acknowledged Mother had a support system of family who resided outside of San Diego; she had been attending church and had gained a support network through her church community; she had completed and received a certificate for parenting education; she was consistent in her visitation with the Children; and she was gainfully employed and working with her housing coordinator to obtain housing that would allow the Children to live with her.

Still, Miller-Wave testified the risk of harm to the Children if they returned to Mother was "[h]igh." She cited Mother's difficulty in providing "a structured environment and setting a tone in a parental role" for the Children, as they "don't often listen to her"; Mother's escalation in reactions in the Children's presence which "can cause confusion and stress" for them and impact their sense of safety and emotional safety, as well as impact Mother's ability to obtain services for them. She also cited the fact that the Children have now resided more than three years outside of Mother's care and "[b]ecause they have spent more of their lives out of her care than in her care, . . . it could be traumatic at this point for them to be returned to [Mother]." Finally, Miller-Wave also testified the Children wanted to be adopted, with the older child stating she does not want to live with or visit with Mother.

Miller-Wave testified the older child currently only requires emotional therapy and both girls had intake appointments to restart KidSTART therapy. The younger child was scratching herself and the current caregivers

15

were using gloves to mitigate the problem and consulting with service providers. She indicated the younger child needed to be re-evaluated for physical therapy and specific language therapy or applied behavioral analysis (ABA) therapy. However, she believed the child had made progress on the scratching and may have stopped the behavior.

She also testified that although the Agency has discretion to expand Mother's visitations pending the section 366.26 hearing, it did not because the permanent plan was for adoption. She explained that once reunification services are terminated, the Agency follows the court's recommendations regarding visitation. In January 2020, the court had denied Mother's request for unsupervised visits.

### 3.    *Griffith-Tate's Testimony*

Griffith-Tate opined Mother could safely care for the girls. When asked to explain Mother's understanding of how domestic violence impacted the Children, Griffith-Tate testified Mother understood "[t]he impact has separated her children from them . . . having the mother-daughter relationship and feeling safe." Griffith-Tate was aware the older child said she did not want to visit Mother and both children pushed Mother away, but she explained there are "adjustment periods" and "transitional period[s]" and the Children were "young enough to sustain that and be able to work through that, . . . especially with the support of family therapy from a child specialist." Griffith-Tate conceded she had never observed a visit between Mother and the Children, and her assessment of Mother was based on her self-reports.

Griffith-Tate testified Mother "demonstrated the ability to listen and not be so reactive" after attending therapy. She questioned why Mother had not been referred to therapy earlier, but also acknowledged that Mother calling the Agency "fucking liars" at a July 2020 placement meeting showed

16

poor emotional regulation.  She further testified the Agency staff misinterpreted Mother due to her mannerisms and reactions, which she attributed to cultural norms.

B.    *Juvenile Court's Rulings*

The court denied Mother's section 388 petition for return of the Children to her or alternatively for continued reunification services.  It found Mother demonstrated changed circumstances, based on her lack of contact with Father, completion of a domestic violence treatment program, parenting classes, and more than a year of individual therapy, and her success in obtaining housing, graduating from a nursing program, and strengthening family and community ties.

Although "commend[ing] [Mother] for her hard work," the court determined it was not in the Children's best interests for them to return to Mother or for the court to continue reunification services.  It noted Mother had "maintained her destructive relationship with [Father]," whom the court found to be "unpredictable, aggressive, and violent, troubled by mental health and substance abuse issues and engaged in a criminal lifestyle," despite her participation in services and the restraining order.  It noted Mother was also arrested for domestic violence against Father and, even without the older child's statements that Mother allowed Father to be present at visits, the arrest demonstrated Mother was still in a relationship with Father as of the summer of 2018.

The court found Mother had not parented the Children in three years, since the older child was two years old and the younger child two months old. Although Mother consistently visited and called the Children, the court found visits "always presented some concern."  It noted her difficulty managing both children and trying to comfort the younger one, and that visits

17

deteriorated further after the adoptive placement "with the children being more resistant," which the court found reasonably reflected their desire for a permanent home and their "more emphatic[ ]" rejection of time with Mother. The court also found the Children had made "great progress with developmental and mental health services."

Focusing on the older child, the court found she was "thriving and happy in her current home and wants to be adopted." She has stated her "unambiguous wish" to stay with her caregivers and "it would be detrimental to her" for the court to remove her from that home. The court also found the older child's relationship with Mother tense, as the child "has been very clear that she does not enjoy the visits" with Mother, perhaps because she has "endured longer exposure to her biological parents' violent relationship" and was "called a liar" by Mother at therapy when she tried to discuss the domestic violence she saw.

The court found the younger child presented a "closer call," and noted there were similarities to the circumstances in *In re J.M.* (2020) 50 Cal.App.5th 833 (*J.M.*), where a child was removed in infancy due to domestic violence between his parents and the mother "eventually, but not immediately" ended the relationship and later "had sufficiently addressed the underlying protective issue in the case." The court noted the appellate court had found in that case the trial court had abused its discretion by not returning the child to mother's care. The court specifically considered the similar circumstances and weighed whether it would be in the younger child's best interest to return only her and "give her the chance to be raised by her biological mother."

The court acknowledged many of the Agency's concerns regarding the younger child "have more to do with the appropriateness of [Mother's]

18

interactions with Agency employees and her elevated voice with her children than with threats to the children's safety." It also acknowledged Mother's "fraught" relationship with the Agency and Griffith-Tate's testimony that Mother's "loudness and over-protectiveness may be misinterpreted as harmful when they were not," and further allowed that Mother's reaction at the July 2020 placement meeting may have been because Mother "was not adequately prepared to hear the discussion" about the Children's adoption.

However, the court noted "the fact remains" that Mother "totally lacks insight into the damage that domestic violence has caused her children or could cause in the future" and "[s]he is also in denial about her own role in the current dependency case." The court found that Griffith-Tate, despite being Mother's "fierce advocate," "was unable to point out anything that [Mother] had said about the impact of domestic violence on the girls other than it separated them from their mother and may have made them unsafe, despite completing a domestic violence group and despite [Mother] being in therapy for over a year." Further, the court found Mother's letter devoid of any "recognition" of "how her behavior has negatively impacted her children," as it appears she "still believe[d] that she did nothing wrong" and that she has been "a victim of the Agency."

The court concluded "[m]ore importantly" that returning the younger child would mean "severing [her] from [her sister,] the only consistent relationship she has had in her young life" and noting the sisters "have never been separated" and "[a]ll of [the younger child's] experiences have been shared with [her sister]." The court concluded "the benefits of preserving their relationship are profound." The court "weighed the sure benefit to [the younger child] of staying in a stable and loving adoptive home" with her sister "who forcefully states that she wants to be adopted, versus the tenuous

19

benefit of being returned to her mother, who had never parented her, [and] where placement may fail[.]"  In the balance, the court concluded Mother had not met her burden of proving that return of the younger child would be in her best interests.  It accordingly denied Mother's section 388 petition.

Finally, the court found by clear and convincing evidence that the Children were both specifically and generally adoptable, and no exception to adoption, including the parent-child bond exception, applied.  The court terminated Mother's parental rights and set a permanent plan of adoption.  Mother appealed.

DISCUSSION

I.

*No Abuse of Discretion in Denial of Section 388 Petition for Modification*

Mother argues the juvenile court abused its discretion when it denied her petition for modification and return of the Children to her with family maintenance services, or alternatively for additional reunification services with expanded visitation.

Under section 388, "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . to change, modify, or set aside any order of [the] court previously made[.]"  (§ 388, subd. (a)(1).)  "At a hearing on a motion for a change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child."  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.

20

Rather, at this point, 'the focus shifts to the needs of the child for permanency and stability' [citations], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317, quoting *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*).) "A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M.*, *supra*, at p. 317.) Therefore, a petitioner at this stage "must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*).)

We review a juvenile court's decision to deny a section 388 petition for abuse of discretion. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) "This determination [is] committed to the sound discretion of the juvenile court, and [its] ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*Ibid.*) "[W]hen a court has made a custody determination in a dependency proceeding, ' "a reviewing court will not disturb that decision unless the [juvenile] court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' " (*Ibid.*) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the [juvenile] court." ' " (*Id.* at pp. 318–319.)

On the record before us, we conclude the court reasonably determined that returning the Children to Mother was not in their best interests and

21

properly denied Mother's section 388 petition.[3] We agree there is no doubt Mother loves the Children and she has made commendable progress in securing education, work, and housing, but those facts are not dispositive of the Children's best interests. At the time she filed her section 388 petition in September 2019, reunification services had ended months earlier, and the Children's need for permanency and stability became the paramount concern. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317–318.) By the hearing in December 2020, the Children had been out of Mother's care for over three years, and in their prospective adoptive home for five months and doing well there.

Returning the Children to Mother would have disrupted the permanency and stability they had finally found, after years in foster care. The older child especially was "thriving and happy in her current home and wants to be adopted," and she "unambiguous[ly] wish[ed]" to stay with her caregivers. In contrast, she had a difficult history and relationship with Mother, and made it "very clear" she did not enjoy visits and did not want to reside with Mother. The evidence also called into question Mother's ability to provide a stable and safe home. She had difficulty managing the Children and acting in a parental role during visits, despite consistent visitation. She lacked insight into the impact of domestic violence on them and her role in creating the harmful situation, even after nearly 20 months of reunification services and even accounting for her strained interactions with the Agency.

---

[3] Mother contends the constitutional nature of her right to the Children's custody must be considered. The dependency system already balances her interests with those of the Children. (*Marilyn H.*, *supra*, 5 Cal.4th at p. 306; *Id.* at p. 309 [§ 388 "provides the 'escape mechanism' . . . to allow the court to consider new information"]; see *In re Angel B.* (2002) 97 Cal.App.4th 454, 461 [§ 388 statutory scheme is "constitutional because of its many safeguards"].)

We agree with the court that removing the older child from her stable home environment would be detrimental to her.

While the court viewed the younger child's case as a "closer call," we conclude the court properly evaluated the evidence, placing particular weight on the devastating impact of separating the siblings, and its determination that it would also not be in the younger child's best interests to be returned to Mother was well within the bounds of reason. As the court aptly noted, "the benefits of preserving [the siblings'] relationship are profound," as they have been each other's constant through all the turmoil. Indeed, the record reflects the older child became a "nurturing big sister" to the younger one.

Although the court noted some similarities with *J.M.*, we find the case distinguishable, and we reject Mother's reliance upon it. (*J.M.*, *supra*, 50 Cal.App.5th at p. 837 [reversing denial of § 388 petition for minor removed in infancy due to domestic violence].) Although the mother in *J.M.* similarly made belated progress addressing domestic violence, the parental relationship with the child in *J.M.* was far different than the one before us. (*Id*. at p. 846.) There, the mother had evidence, including from the social services agency, that she was ready and able to care for the child and their relationship was "blossoming." (*Id*. at pp. 838–840, 849.) Those are not the facts here. Miller-Wave, the Children's adoption case worker for over a year and a half and who had personally observed at least 15 visits with Mother, believed there was a high risk of harm to the Children, including the younger child, if they were returned to Mother. There was evidence that Mother had difficulty comforting the younger child, who at the time of the hearing referred to her current caregivers as "Mommy" and "Daddy" and still sometimes rejected Mother's affection.

Further still, it was noted in *J.M.* that return of the child could provide him with the benefit of extended family. (*J.M.*, *supra*, 50 Cal.App.5th at pp. 843, 849 [mother's brothers and paternal grandmother could offer minor "an extended biological family, with whom [he] could remain connected"; mother testified grandmother agreed to help with childcare].) Here, returning the younger child to Mother without her older sister meant *disrupting* her only existing familial bond, and there was no benefit of Mother's extended family to speak of because the Children had not met Mother's teenage son, only the older child had met Mother's adult daughter (only once), and both older siblings lived outside of California. (Compare *J.M.*, at p. 849; cf. *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529–530 (*Kimberly F.*) [noting interest in preserving existing family unit].)

Mother's reliance on the factors set forth in *Kimberly F.* is also unhelpful. The *Kimberly F.* court criticized a best interests assessment that consisted of simply comparing the households of the biological and adoptive parents, and identified three nonexclusive factors to determine best interests: "(1) The seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Kimberly F., supra*, 56 Cal.App.4th at pp. 530–532.) Courts of Appeal have declined to apply these factors because they do not focus on permanency and stability, as required by the high court's decision in *Stephanie M.*—but some, like *J.M.*, have embraced them again, at least as part of a larger analysis. (Compare *J.C.*, *supra*, 226 Cal.App.4th at p. 527 [declining to apply *Kimberly F.* factors, as they did not take *Stephanie M.* analysis into account]; cf. *In re K.L.* (2016) 248 Cal.App.4th 52, 62

24

[focusing on permanency and stability]; with *J.M.*, *supra*, 50 Cal.App.5th at p. 848; *In re I.B.* (2020) 53 Cal.App.5th 133, 163 [same court that issued *J.C.* held trial court did not err by using *Kimberly F.* factors as part of "holistic evaluation"; explaining they did not apply factors in *J.C.* because mother there "failed to address the more important concepts of permanency and stability" under *Stephanie M.*, whereas mother at issue showed she could "immediately provide . . . a permanent and stable home"].)

We do not need to take a position on the viability of the *Kimberly F.* factors in this appeal, because even if they apply, they do not aid Mother.

First, regarding the seriousness of the problem which led to the dependency, Mother acknowledges the domestic violence problem was serious and she was slow to address it. However, she disputes there is any reason for the problem to continue, citing Griffith-Tate's testimony that she had met her therapeutic goals and Miller-Wave's testimony that she does not believe Mother is in contact with Father. But as the juvenile court observed, Griffith-Tate could not identify any real insight by Mother into the impact of domestic violence on the Children and Miller-Wave believed it was not in the Children's best interest for them to return to Mother as it posed a "high" risk, including because her escalated reactions could impede the Children receiving services if the need arose. Moreover, we note Miller-Wave's observation that Father was incarcerated for the "majority of the past year" and she believed he was released only a month before the hearing, which could in part explain the absence of any reoccurrence of domestic violence in 2020.

Second, regarding the strength of relative bonds between the dependent children to *both* parent and caregivers, Mother argues the Children's relationship with her was "more significant," as she was a

constant presence in their lives, and the visitation logs reflected positive interactions and bonding. In contrast, she claims, the Children were only with the caregivers a short time and calling them "Mommy" and "Daddy" so soon showed attachment disorder.[4] Mother ignores, however, the evidence that the Children did not see her in a parental role, they had mixed and negative interactions with her at visits, and they were doing well with the caregivers. At the time of the hearing, the Children were still calling their caregivers "Mommy" and "Daddy" and sought them for comfort. Mother essentially asks us to reweigh the evidence, which we may not do. (*See Stephanie M.*, *supra*, 7 Cal.4th at p. 319.)

Mother also suggests certain issues were not adequately addressed by the Agency or juvenile court, including why the Children rejected her affection, the in-person visitation gap during the pandemic, and the benefit of her extended family. The Agency reports were adequate, as we discuss *post*, and the court sufficiently addressed these issues. Further, we presume the court performed its regular duty and considered these matters to the extent relevant. (Evid. Code, § 664; see *In re Julian R.* (2009) 47 Cal.4th 487, 498–499.)

As to the third factor, the ease of resolving the removal issue, Mother argues she has made extensive changes and Griffith-Tate explained Mother did not make these changes sooner because of barriers from cultural norms and Mother was belatedly offered therapy. But part of the court's concern was that Mother *had* received services like counseling, and still she did not

_____

4    We note Mother cites no record or legal support for her claim about attachment disorder. (See *In re J.F.* (2019) 39 Cal.App.5th 70, 79 [" ' "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' "].)

have meaningful insight into the domestic violence issue that led to the dependency. The court specifically considered that "[t]he reunification social worker . . . noted that in her 22 years as a social worker, she had never put in place as many supports and services as she had for [Mother], but she was still worried about the [Children's] safety in their mother's care." Moreover, Mother does not explain how increased attention to her cultural background or earlier counseling would have mitigated this concern. We also note the Agency provided Mother with a Tagalog interpreter for her participation in parenting education to remove any such barrier.

Finally, Mother argues the Agency's decision to not expand visits after she filed her section 388 petition, was "perhaps the most significant barrier" to being in a stronger position to seek return or more services. But the problem was not the amount of visitation, but the quality. Mother had difficulty interacting with the Children well before reunification services were terminated and this did not improve over time.

In sum, we conclude the juvenile court did not abuse its discretion in denying Mother's section 388 petition.

## II.

*Substantial Evidence Supported Juvenile Court's Finding of Adoptability*

Mother argues the juvenile court erred in terminating her parental rights because there was not substantial evidence to support its finding that the Children were generally and specifically adoptable.

"The court may terminate parental rights 'only if it determines by clear and convincing evidence that it is likely that the minor will be adopted.' " (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249 (*Cynthia D.*), quoting § 366.22, subd. (c)(1).) "If the court so determines, the findings, 'pursuant to Section 366.21 or Section 366.22, that a minor cannot or should not be

returned to his or her parent . . ., shall then constitute a sufficient basis for termination of parental rights unless the court finds that termination would be detrimental to the minor' due to any of certain specified circumstances. (§ 366.26, subd. (c).)" (*Cynthia D.*, at p. 249.) "Thus, in order to terminate parental rights, the court need only make two findings:  (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated." (*Id.* at pp. 249–250.)

"The question of adoptability usually focuses on whether the child's age, physical condition and emotional health make it difficult to find a person willing to adopt that child." (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 13 (*Valerie W.*).)  "If the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home." (*Ibid.*)  Moreover, "it is not necessary that the minor already be in a potential adoptive home," but the fact that one exists is evidence that "the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649–1650.)

"On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence that the child was likely to be adopted within a reasonable time." (*Valerie W., supra*, 162 Cal.App.4th at p. 13.)  "The evidence must be sufficiently strong to command the unhesitating assent of every reasonable mind." (*Ibid.*)  "We give the court's adoptability finding the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of the judgment." (*Ibid.*)  Even though "a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold:  The

court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

We conclude there was substantial evidence from which the juvenile court could find by clear and convincing evidence that the Children were generally and specifically adoptable. The Agency's section 366.26 report identified them as "highly adoptable," described the characteristics that made them generally adoptable, including age and demeanor, and stated there were families willing to adopt children with some developmental and mental health issues. The Children were later placed with their prospective adoptive parents, and had been doing well in the new home for five months as of the section 366.26 hearing. The older child was excelling in school, despite her ADHD diagnosis, and although the younger child had more substantive development issues, the caregivers were aware of and addressing them. (See, e.g., *In re Helen W.* (2007) 150 Cal.App.4th 71, 79–80 [foster mother was aware of minors' conditions, including autism spectrum disorder, possible bipolar disorder, and motor skill delays, and willing to adopt].) The record thus provides ample evidence that the Children were likely to be adopted within a reasonable time.

Mother's arguments do not compel a different result. Her primary contention is that the Agency reports "did not adequately address the minors' mental and emotional status as required by section 366.21(i)(1)(C)," and that such omissions were not harmless. The Agency argues she forfeited any objection to the sufficiency of the reports by not raising it below, and this position has force. (See *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411 [failure to "object[ ] to the sufficiency of the assessment reports" waives issue on appeal]; *In re Aaron B.* (1996) 46 Cal.App.4th 843, 846 [forfeiting adequacy of adoption assessment by not raising issue below]; compare *Valerie*

*W.*, *supra*, 162 Cal.App.4th at p. 7 [parties raised adequacy of Agency's assessment in superior court].)

However, even if we reached Mother's objection, we would reject it. When a case is set for a section 366.26 hearing, the Agency prepares an assessment on various issues, including the child's relationship with any identified prospective adoptive parents and the likelihood of adoption. (§ 366.21, subd. (i) [hearing set from six or 12 month review].) Pertinent here, the assessment must include "[a]n evaluation of the child's medical, developmental, scholastic, mental, and emotional status." (§ 366.21, subd. (i)(1)(C).) The Agency's reports adequately addressed the required topics, including by describing the Children's diagnoses, services, and progress. The reports therefore fulfilled the statutory requirements and, with the evidence at the hearing, provided substantial evidence for adoptability. (*In re John F.* (1994) 27 Cal.App.4th 1365, 1378 ["[s]ubstantial compliance with the assessment provisions has been deemed enough"].)

Mother maintains the Children have "significant and unresolved behavioral and mental health issues," and the Agency reports omit "information from the minors' therapists or their mental health assessments," including current information. Her reliance on *Valerie W.* here is misplaced. One of the children in *Valerie W.* was going to be "tested for a serious genetic or neurological disorder," but the reports did not address the results or his most recent pediatric visit. (*Valerie W.*, *supra*, 162 Cal.App.4th at pp. 6, 14 [inadequate assessment undermined adoptability finding].) Here, Mother does not establish the Children had a comparable condition for which information was lacking and which could impact adoptability. She contends the court did not have the KidSTART therapy intake interview and questions why the social worker did not consult the therapist about the adoptive

30

placement. There is, however, no indication a specific issue spurred the therapy referral. Rather, the evidence is that the therapist felt it was "a good idea to expand emotional therapy," which was reasonable given the Children's tender ages and experiences to date. The other pending evaluations were for known issues already being addressed, like the younger child's scratching and other behaviors, or for screening purposes, such as to see if the older child still needed an IEP. *Valerie W.* is distinguishable in other respects, too; unlike here, the report was the only evidence at the section 366.26 hearing and there were questions about the prospective adoptive parents. (See *Valerie W.*, *supra*, 162 Cal.App.4th at pp. 7, 13–15.)

We also disagree with Mother that the purported error would not be harmless. *In re Michael G.* (2012) 203 Cal.App.4th 580 is instructive. The court ordered a psychological evaluation for a defiant and aggressive child who had been in a stable foster home for just three months, but ruled he was adoptable *without* the evaluation results or an updated therapist report. (*Id.* at pp. 590–591.) The appellate court held the error was harmless, given the other evidence in the record. (*Id.* at p. 591.) Among other things, the child's issues diminished with his caregiver, showing an adoptive parent could manage them, and neither his caregiver nor his teacher reported significant problems. (*Id.* at pp. 592–593.) The lack of prejudice is even clearer here. The Children's issues do not implicate a similar risk of harm—there was no similarly significant evaluation pending and, as discussed *ante*, there was ample other evidence to support adoptability, including the Children's

31

current placement with adoptive parents who are already attending to their needs.[5]

To the extent Mother's arguments go to the sufficiency of the evidence, they still lack merit. For example, she asserts the Children have significant, unresolved issues, but discusses their entire developmental history, including now-resolved concerns like the older child's speech impediment, and ignores accomplishments like her being at the top of her class. For the issues that may persist, like the younger child's scratching habit, she also fails to acknowledge the significance of the caregivers' awareness and efforts to help. In other words, Mother magnifies the Children's challenges but minimizes their progress, even though substantial evidence review requires drawing inferences in *favor* of the judgment. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

We conclude the juvenile court did not err in finding the Children were adoptable and terminating Mother's parental rights.

---

[5] Other cases cited by Mother here are distinguishable, and do not aid her. (See *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205 [insufficient evidence where, inter alia, adoptability was based on caregiver's desire to adopt and there were gaps in his criminal and child welfare history]; *In re B.D.* (2008) 159 Cal.App.4th 1218, 1233 [criticizing adoptability findings for five siblings, where three had developmental problems and there was no prior relationship with family seeking to adopt them, but affirming based on postjudgment evidence that minors were in prospective adoptive home].)

## DISPOSITION

The orders are affirmed.

DO, J.

WE CONCUR:


HALLER, Acting P. J.


DATO, J.